NEENAH FOUNDRY CO.,
Plaintiff-Appellant,

v.

LABOR & INDUSTRY REVIEW COMMISSION and
Department of Workforce Development,
Bureau of Legal Affairs,
Defendants-Respondents.

Court of Appeals

*No. 2014AP1113. Submitted on briefs November 5, 2014.
—Decided January 29, 2015.*

2015 WI App 18

(Also reported in 860 N.W.2d 524.)

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Thomas L. Shriner, Jr.*, and *Rachel M. Blise* of *Foley & Lardner LLP*, Milwaukee.

On behalf of the defendant-respondent Labor & Industry Review Commission, the cause was submitted on the brief of *William Sherlin Sample* of Madison.

On behalf of the defendant-respondent Department of Workforce Development, the cause was submitted on the brief of *Daniel J. LaRocque* and *Andrew J. Rubsam* of Madison.

Before Lundsten, Sherman and Kloppenburg, JJ.

¶ 1. LUNDSTEN, J. Neenah Foundry Co. appeals the circuit court's order upholding a Labor and Industry Review Commission (LIRC) decision. After Neenah Foundry emerged from Chapter 11 reorganization in federal bankruptcy court, LIRC denied Neenah Foundry's request to be treated as a new employer for purposes of Wisconsin's unemployment insurance law. The effect of LIRC's decision is that, over a seven-year period, Neenah Foundry will pay between $393,216 and $564,780 more into the unemployment insurance system than it would have paid as a new employer.

¶ 2. Neenah Foundry argues that LIRC erred in interpreting the applicable statute, WIS. STAT. § 108.16(8) (2011–12).[1] More specifically, Neenah Foundry argues that, contrary to LIRC's interpretation, Neenah Foundry is eligible to be treated as a new employer because both of the following are true: (1) the Chapter 11 reorganization proceedings resulted in the "transfer" of Neenah Foundry's business, as that term is used in § 108.16(8)(a), and (2) Neenah Foundry is not a "mandatory successor" under § 108.16(8)(e). Neenah Foundry argues in the alternative that federal

---

[1] All references to the Wisconsin Statutes are to the current version of the statutes, the 2011–12 version. Although Neenah Foundry's unemployment insurance contribution rates for several years are at issue, the parties' arguments do not indicate that there have been any pertinent changes to the applicable statutes during that time.

bankruptcy law preempts LIRC's determination that Neenah Foundry is a mandatory successor.

¶ 3. LIRC and the Department of Workforce Development are respondents. They argue that LIRC's decision is entitled to great weight deference and should be upheld.

¶ 4. We assume, without deciding, that Neenah Foundry's Chapter 11 reorganization resulted in a "transfer" under WIS. STAT. § 108.16(8)(a). However, even assuming there was a transfer, Neenah Foundry loses on the mandatory successor issue. More specifically, we conclude that LIRC is entitled to great weight deference on the mandatory successor issue, and that LIRC reasonably interpreted § 108.16(8)(e) to determine that Neenah Foundry is a mandatory successor. We reject Neenah Foundry's federal preemption argument. Accordingly, we affirm.

### Background

¶ 5. From mid-2008 through 2009, Neenah Foundry saw dramatic declines in demand for its products. Starting in 2009, Neenah Foundry laid off a large number of employees, directly leading to what is referred to as an adverse "experience rating" and a corresponding increase in its unemployment insurance contribution rates. As Neenah Foundry explains in its briefing:

> The [unemployment insurance] system is currently administered by the Department, which sets an employer's contribution rate based on [the employer's] "experience rating." New employers without any experience pay into the fund at a prescribed rate for the first three years, after which their layoff experience is taken into account. If they lay off a lot of employees,

they acquire an adverse experience rating and a correspondingly high contribution rate.

¶ 6. In February 2010, Neenah Foundry filed a voluntary petition for Chapter 11 reorganization in federal bankruptcy court. The bankruptcy court confirmed Neenah Foundry's Chapter 11 reorganization plan in July 2010.[2]

¶ 7. Under the Chapter 11 reorganization plan, Neenah Foundry remained a wholly owned subsidiary of a company called NFC Castings, Inc., which in turn remained a wholly owned subsidiary of a company called Neenah Enterprises, Inc. However, Neenah Enterprises' common stock was cancelled and new common stock was issued so that Neenah Enterprises came under the ownership of the three companies' former creditors. Reorganization also resulted in an entirely new board of directors. However, Neenah Foundry's executive team remained largely the same. Just two of the top eight executive officers were replaced. Moreover, Neenah Foundry's business activi-

---

[2] The Seventh Circuit Court of Appeals summarized Chapter 11 reorganization as follows:

> By filing under Chapter 11, the debtors became debtors-in-possession, authorized to continue operating their businesses while preparing a plan of reorganization, to be approved by their creditors. This plan, and an accompanying disclosure statement, would be reviewed and approved by the bankruptcy court and then circulated to all creditors. Upon approval of the plan by the creditors, it would become a binding contract between the debtors and the creditors.

*Peterson v. Scott*, 172 F.3d 959, 962 (7th Cir. 1999) (citations omitted). Debtor-in-possession status is typical during Chapter 11 proceedings, but the court may appoint a trustee to oversee the reorganization according to criteria in 11 U.S.C. § 1104. *See Scott*, 172 F.3d at 962–64.

ties, its assets, its 833 employees, and its physical facility remained the same as of the reorganization plan's confirmation date.[3]

¶ 8. After the Chapter 11 reorganization, Neenah Foundry filed a request with the Department of Workforce Development to be treated as a new employer in order to obtain a new employer experience rating and, thereby, reduce its unemployment insurance contribution rates. A Department employee denied this initial request, and Neenah Foundry appealed to the Department's "appeal tribunal." *See* WIS. STAT. § 108.10(2) ("Any hearing duly requested [on unemployment insurance issues other than benefit claims] shall be held before an appeal tribunal . . . ."). The appeal tribunal, an administrative law judge, affirmed the Department's initial determination.

¶ 9. Neenah Foundry sought review before LIRC. LIRC concluded that there was no "transfer" within the meaning of WIS. STAT. § 108.16(8)(a) because there were not distinct transferor and transferee entities, such that Neenah Foundry "transferred nothing." In addition, LIRC determined that, even if there was a "transfer," Neenah Foundry was not entitled to the new employer rate because the surviving entity was a mandatory successor. LIRC also rejected Neenah

---

[3] We omit additional, non-pertinent details regarding Neenah Foundry's reorganization plan. For example, it appears that, pursuant to the plan, Neenah Foundry filed documents converting Neenah Foundry from a Wisconsin corporation to a Delaware corporation while retaining its name and federal employer identification number. The parties dispute whether Neenah Foundry is the same legal entity or a new legal entity as a result of the Chapter 11 proceedings but, as far as we can tell, this dispute pertains only to the transfer issue that we do not address on the merits. We therefore do not weigh in on this same-entity-or-new-entity dispute.

Foundry's preemption argument. We reference additional facts as needed below.

### *Discussion*

██

¶ 10. The parties agree on the general legal framework. When a transferor employer "transfer[s]" an "asset" or "activity," as those terms are used in the relevant statutes and administrative code, the transferee employer may become eligible to pay unemployment insurance contribution rates at the new employer rate. *See* WIS. STAT. §§ 108.16(8)(a) and (j) and 108.18(2); WIS. ADMIN. CODE § DWD 115.11 (Dec. 2014); *see also* WIS. ADMIN. CODE § DWD 115.01 (Dec. 2014) (defining what does and does not constitute a transfer). Stated another way, the transferee employer may be eligible for a new employer experience rating. If, however, the transferee employer is deemed a "mandatory successor" according to statutory criteria, the transferee employer is ineligible for the new employer rate. *See* § 108.16(8)(e) and (f); WIS. ADMIN. CODE §§ DWD 115.05 and 115.10 (Dec. 2014).[4] Stated another way, a mandatory successor must retain the adverse experience rating.

██

¶ 11. We review LIRC's decision, not the circuit court's decision. *Oshkosh Corp. v. LIRC*, 2011 WI App 42, ¶ 6, 332 Wis. 2d 261, 796 N.W.2d 217. Neenah Foundry argues that LIRC erred because the Chapter

---

[4] The parties use the term "mandatory successor," as do we. The term is not in the applicable statute, but it does appear in the administrative code. *See* WIS. ADMIN. CODE § DWD 115.05; *see also First Fed. Sav. Bank v. LIRC*, 200 Wis. 2d 786, 793, 547 N.W.2d 796 (Ct. App. 1996) (using the term).

11 proceedings resulted in a "transfer," as that term is used in WIS. STAT. § 108.16(8)(a), and because Neenah Foundry is not a mandatory successor under § 108.16(8)(e). Additionally, Neenah Foundry argues that LIRC erred because federal bankruptcy law pre-empts LIRC's determination that Neenah Foundry is a mandatory successor.

¶ 12. As we understand Neenah Foundry's brief-ing, the net result for Neenah Foundry is the same if either of the following is true: (1) there was no transfer, *or* (2) assuming there was a transfer, Neenah Foundry meets the criteria for a mandatory successor. Thus, as far as we can tell, there is no need to address the transfer issue if Neenah Foundry is a mandatory successor. We assume, without deciding, that Neenah Foundry's Chapter 11 reorganization resulted in a transfer under WIS. STAT. § 108.16(8)(a) because, even assuming there was a transfer, Neenah Foundry loses on the mandatory successor issue for the reasons we explain below.[5]

¶ 13. In determining that Neenah Foundry was a mandatory successor, LIRC interpreted and applied WIS. STAT. § 108.16(8)(e), which provides that an em-ployer is a mandatory successor if three listed condi-tions are met. Neenah Foundry effectively concedes that two of the three conditions are met here. The company disputes only one of the conditions, namely,

---

[5] To be precise, Neenah Foundry argues that there were *two* transfers, one when Neenah Foundry filed its Chapter 11 petition for reorganization in bankruptcy court, and another when the bankruptcy court confirmed Neenah Foundry's Chapter 11 reorganization plan. However, Neenah Foundry presents no argument as to why it might matter here whether there was one transfer or two, and we see no reason why we need to address the question.

whether pre-Chapter-11 Neenah Foundry and post-Chapter-11 Neenah Foundry are "owned, managed, or controlled in whole or in substantial part, either directly or indirectly by legally enforceable means or otherwise, by the same interest or interests." *See* § 108.16(8)(e)1.[6] LIRC determined that post-Chapter-11 Neenah Foundry remained under "direct management in substantial part by the same interests" because, after its reorganization, Neenah Foundry retained six of its eight pre-Chapter 11 executive officers.

¶ 14. Our remaining analysis is in three parts. First, we explain why we conclude that LIRC's mandatory successor determination under WIS. STAT. § 108.16(8)(e) is entitled to great weight deference. Second, we explain why we conclude that LIRC rea-

---

[6] WISCONSIN STAT. § 108.16(8)(e) provides, in full:

(e) Notwithstanding par. (b), a transferee is deemed a successor for purposes of this chapter, if the department determines that all of the following conditions are satisfied:

1. At the time of business transfer, the transferor and the transferee are owned, managed, or controlled in whole or in substantial part, either directly or indirectly by legally enforceable means or otherwise, by the same interest or interests. Without limitation by reason of enumeration, it is presumed unless shown to the contrary that the "same interest or interests" includes the spouse, child, or parent of the individual who owned, managed or controlled the business, or any combination of more than one of them.

2. The transferee has continued or resumed the business of the transferor, either in the same establishment or elsewhere; or the transferee has employed substantially the same employees as those the transferor had employed in connection with the business transferred.

3. The same financing provisions under s. 108.15, 108.151, 108.152, or 108.18 apply to the transferee as applied to the transferor on the date of the transfer.

sonably interpreted § 108.16(8)(e). And, third, we reject Neenah Foundry's federal preemption argument.

## 1. Level Of Deference

¶ 15. The parties dispute the level of deference that we apply to LIRC's determination that Neenah Foundry is a mandatory successor under WIS. STAT. § 108.16(8)(e). For the reasons below, we conclude that great weight deference is appropriate.

¶ 16. Although courts are never bound by an agency's interpretation of a statute, courts "will under certain circumstances give deference to an agency's statutory interpretation." *MercyCare Ins. Co. v. Wisconsin Comm'r of Ins.*, 2010 WI 87, ¶ 27, 328 Wis. 2d 110, 786 N.W.2d 785. More specifically:

> A reviewing court accords an agency's statutory interpretation no deference when the issue is one of first impression, when the agency has no experience or expertise in deciding the legal issue presented, or when the agency's position on the issue has been so inconsistent as to provide no real guidance. When no deference to the agency decision is warranted, the court interprets the statute independently and adopts the interpretation that it deems most reasonable.

> A reviewing court accords due weight deference when the agency has some experience in an area but has not developed the expertise that places it in a better position than the court to make judgments regarding the interpretation of the statute. When applying due weight deference, the court sustains an agency's interpretation if it is not contrary to the clear meaning of the statute—unless the court determines that a more reasonable interpretation exists.

> Finally, a reviewing court accords great weight deference when each of four requirements are

472

met: (1) the agency is charged by the legislature with the duty of administering the statute; (2) the agency's interpretation is one of long standing; (3) the agency employed its expertise or specialized knowledge in forming its interpretation; and (4) the agency's interpretation will provide uniformity and consistency in the application of the statute. When applying great weight deference, the court will sustain an agency's reasonable statutory interpretation even if the court concludes that another interpretation is equally or more reasonable. The court will reverse the agency's interpretation if it is unreasonable—if it directly contravenes the statute or the state or federal constitutions, if it is contrary to the legislative intent, history, or purpose of the statute, or if it is without a rational basis.

*Id.*, ¶¶ 29–31 (citations omitted).

¶ 17. Neenah Foundry argues that there are two reasons why we should give no deference to LIRC's interpretation of the mandatory successor statute. We reject both.

¶ 18. First, Neenah Foundry contends that "the question presented—the applicability of § 108.16(8) to a reorganized debtor emerging from chapter 11 bankruptcy under a confirmed plan of reorganization—is one of first impression in Wisconsin." As we understand it, what Neenah Foundry means to argue is that, although LIRC has extensive experience interpreting the statute, LIRC has never before applied WIS. STAT. § 108.16(8) to an entity emerging from Chapter 11 reorganization.

¶ 19. Neenah Foundry's "first impression" argument misses the mark because it misconstrues the meaning of "first impression" in this context. "We have consistently held that an agency decision is not auto-

473

matically one of first impression and subject to de novo review simply because the agency has been presented with a particular fact situation it has not previously ruled upon." *Lopez v. LIRC*, 2002 WI App 63, ¶ 13, 252 Wis. 2d 476, 642 N.W.2d 561. Rather, an issue of first impression refers to a situation in which an agency is interpreting a statutory provision for the first time. *Id.* Here, there is no question that LIRC has previously interpreted the mandatory successor provisions in the statute, as evidenced in part by prior LIRC decisions that Neenah Foundry cites. *See Aggressive Pitbull Sec. Inc.*, No. S0500123MW (LIRC, Feb. 27, 2008); *Sunshine Biscuits Inc. & Keebler Co.*, No. S9700259MD (LIRC, Nov. 18, 1998); *see also Edis Trucking Inc.*, No. S0900091MW (LIRC, July 23, 2013); *Weatherguard Sys. Inc.*, No. S0600015AP (LIRC, Feb. 22, 2008).

¶ 20. Second, Neenah Foundry appears to argue that we should give no deference to LIRC because the "agency's position on the issue has been so inconsistent as to provide no real guidance." *See MercyCare*, 328 Wis. 2d 110, ¶ 29. The problem here is that Neenah Foundry points to no inconsistencies in decision making *by LIRC,* the pertinent agency. Rather, Neenah Foundry relies on alleged inconsistencies that arise when comparing LIRC's reasoning to the circuit court's or Department's reasoning. Neenah Foundry cites no authority to support the proposition that this inconsistency matters and, therefore, we consider the inconsistency argument no further.

¶ 21. Accordingly, we reject Neenah Foundry's contention that LIRC's decision is entitled to no deference. The question remains then whether due weight deference or great weight deference is appropriate.

¶ 22. The Department and LIRC both argue that LIRC's decision should receive great weight deference. We agree that LIRC's mandatory successor determination is entitled to great weight deference.

¶ 23. As we have seen, a reviewing court accords great weight deference when four criteria are met:

1) "the agency is charged by the legislature with the duty of administering the statute";

2) "the agency's interpretation is one of long standing";

3) "the agency employed its expertise or specialized knowledge in forming its interpretation"; and

4) "the agency's interpretation will provide uniformity and consistency in the application of the statute."

*Id.*, ¶ 31. Neenah Foundry does not seriously dispute the first and fourth criteria. That leaves the second and third.

¶ 24. The second ("long standing") and third ("expertise") criteria are closely related, and the critical inquiry regarding both is whether the agency has significant experience interpreting and applying the statutory provision at issue to a variety of factual situations. In an apparent reference to both of these criteria, we explained in *Lopez*:

> [I]f the agency has experience in administering the particular statutory scheme, derived from considering a variety of factual situations and circumstances, then great weight deference is appropriate. We conclude

> that is the case here. The legislature has charged LIRC with the authority to make determinations [of the type at issue in *Lopez*]. LIRC has applied [the statute at issue in *Lopez*] in many situations, and both parties point to prior decisions as the bases for their respective arguments. Consequently, LIRC has developed an expertise in applying the statute to a variety of fact situations.

*Lopez*, 252 Wis. 2d 476, ¶ 13 (citation omitted); *see also Brown v. LIRC*, 2003 WI 142, ¶¶ 17–18, 267 Wis. 2d 31, 671 N.W.2d 279 (applying great weight deference to LIRC's interpretation and application of statute when LIRC had extensive experience interpreting the statute and had developed pertinent specialized knowledge through that experience); *City of Appleton Police Dep't v. LIRC*, 2012 WI App 50, ¶¶ 15, 17, 19–20, 340 Wis. 2d 720, 813 N.W.2d 237 (applying great weight deference to LIRC's interpretation and application of statute to new fact situation when LIRC had extensive experience interpreting statute).

¶ 25. We follow the same approach here. Much as LIRC had experience with the pertinent statutory provisions at issue in *Lopez*, *Brown*, and *City of Appleton*, LIRC here has experience interpreting and applying the mandatory successor provisions in a variety of factual situations, again as evidenced by prior LIRC decisions, including decisions that Neenah Foundry cites. *See* ¶ 19, *supra*.

¶ 26. Indeed, we do not perceive Neenah Foundry to be seriously arguing that LIRC has not repeatedly interpreted and applied the mandatory successor provisions. Instead, as we understand it, Neenah Foundry's arguments against great weight deference appear to focus on whether LIRC has previ-

ously determined whether Chapter 11 reorganization would result in a *transfer* and whether LIRC has the necessary experience or expertise to make a "transfer" determination consistent with federal bankruptcy law. While the transfer issue arguably depends, in part, on federal bankruptcy law, we see nothing about the mandatory successor issue that similarly depends on bankruptcy law. Rather, the mandatory successor issue requires LIRC to compare Neenah Foundry's ownership, management, and control before and after the Chapter 11 proceedings. Indeed, Neenah Foundry concedes in its briefing that LIRC must make this comparison without regard to the "intervening transfer" or the debtor's status during the Chapter 11 proceedings. Accordingly, we do not find Neenah Foundry's arguments against great weight deference persuasive as to the Department's mandatory successor determination.

¶ 27. To sum up, we agree with the Department and LIRC that LIRC's mandatory successor determination is entitled to great weight deference. As we indicated earlier, when we apply great weight deference, we uphold a reasonable agency interpretation even if we conclude that another interpretation is equally or more reasonable. *MercyCare*, 328 Wis. 2d 110, ¶ 31. In the next section, we examine whether LIRC's determination is a reasonable interpretation of the disputed mandatory successor provision.

*2. Reasonableness Of LIRC's Mandatory Successor Determination*

██ ██

¶ 28. To repeat, our focus here is on language in Wis. Stat. § 108.16(8)(e)1. conditioning mandatory successor status on whether pre-Chapter-11 Neenah

Foundry and post-Chapter-11 Neenah Foundry are "owned, managed, or controlled in whole or in substantial part, either directly or indirectly by legally enforceable means or otherwise, by the same interest or interests." *See* § 108.16(8)(e)1.

¶ 29. In interpreting and applying this statutory language, LIRC appeared to acknowledge that, pursuant to Neenah Foundry's reorganization, new stockholders took ownership of Neenah Foundry's parent companies, a new board of directors was appointed, and the new board appointed a new interim president/chief executive officer and a new interim chief financial officer. However, LIRC determined that Neenah Foundry's retention of six of its eight top executives, including its chief operating officer and corporate controller, constituted "direct management in substantial part by the same interests." More specifically, LIRC reasoned:

> [Neenah Foundry's parent company] did put in place a completely new board of directors, which in turn appointed a new interim president and CEO and a new interim CFO. It retained six of the eight pre-petition officers, however, with four of them staying in their pre-petition positions, including COO Andrews and VP-Corporate Controller Gitter. Where the line is drawn is going to vary, depending upon the percentages of retention and the positions in which individuals are retained, but the present scenario easily constitutes direct management in substantial part by the same interests.

Thus, LIRC focused on who "managed" Neenah Foundry before and after the Chapter 11 proceedings instead of who "owned" or "controlled" Neenah Foundry before and after those proceedings. *See* WIS. STAT. § 108.16(8)(e)1.

478

¶ 30. We conclude that LIRC's interpretation of the statute is reasonable. As the Department aptly puts it, the statute has "unmistakable breadth." The statute broadly refers to whether an employer is "owned, managed, *or* controlled in whole *or in substantial part, either* directly *or* indirectly by legally enforceable means *or otherwise,* by the same interest or interests." Wis. Stat. § 108.16(8)(e)1. (emphasis added). Given this broad language and Neenah Foundry's retention of six of its eight officers, including its chief operating officer and corporate controller, LIRC reasonably determined that Neenah Foundry was, in the words of the statute, "managed . . . in substantial part . . . directly . . . by the same . . . interests" as before the Chapter 11 reorganization. *See id.*[7]

¶ 31. Neenah Foundry's arguments to the contrary seem to start from the assumption that only board members, not officers, "manage" a corporation within the meaning of Wis. Stat. § 108.16(8)(e)1. or corporate law more generally. However, Neenah Foundry provides no support for this assumption. And, even if Neenah Foundry's assumption represented one reasonable interpretation of "manage," we conclude that the Department reasonably gave "manage" a broader interpretation to include the duties of Neenah Foundry's corporate officers. *See* 2A Fletcher Cyclopedia of the Law of Corporations § 665, at 233 (rev. vol. 2009) ("In all but the smallest companies, . . . the board delegates managerial responsibilities to subordinate officers or agents . . . ."); *see also* Wis. Stat. §§ 180.0840 and 180.0841 (providing that "[a] corpora-

---

[7] The remaining four officers held the following titles after reorganization: Vice President-Industrial Sales and Operations, Vice President-Purchasing, Vice President-Municipal Sales and Operations, and Vice President-Technology.

tion shall have the officers described in its bylaws or appointed by its board of directors" and that "[e]ach officer has the authority and shall perform the duties set forth in the bylaws or . . . prescribed by the board of directors").

¶ 32. Neenah Foundry's primary remaining argument, as we understand it, is a variation on the same theme, that is, that Neenah Foundry's officers do not "manage" the corporation. Specifically, Neenah Foundry argues that corporate officers—unlike stockholders and the board of directors—cannot be "interests" that direct the company under the statute because officers are not "interests," but rather serve the interests of the owners and the board. The effect of this interpretation of "interests" is to make officers irrelevant under the statute in terms of who "managed" the company. Assuming for argument sake only that this is a reasonable interpretation of the statute, we are satisfied that LIRC's interpretation is also reasonable. Plainly, a company's executive officers typically engage in the management of a company and, under a broad interpretation of the statute, are persons with an interest in the company, even if they also serve the interests of others.

¶ 33. Neenah Foundry also appears to argue that, even if officers sometimes "manage" or "control" a corporation under Wis. Stat. § 108.16(8)(e)1., there is no basis to conclude that Neenah Foundry's retained officers "managed" here because there was "*no* evidence" regarding their duties. We disagree. We observe that, to the extent this argument adds to Neenah Foundry's prior arguments, it is a factual argument, and the question is simply whether the record supports a reasonable inference that Neenah Foundry's retained officers exercised significant management au-

thority. *See CBS, Inc. v. LIRC*, 219 Wis. 2d 564, 570, 579 N.W.2d 668 (1998) ("[W]e must consider conclusive any finding by the commission based upon a reasonable inference . . . ."). Based on the retained officers' titles as already described, and on Neenah Foundry's 833–employee size, we conclude that LIRC could reasonably infer that the retained officers exercised significant management authority.[8]

¶ 34. In an argument that seems inconsistent with its "no evidence" argument, Neenah Foundry asserts that some of its retained officers received new responsibilities. And, indeed, the record shows that some of the officers received different titles. Taking it as true that those officers also received new responsibilities, that does not render LIRC's decision unreasonable.

¶ 35. We recognize that reasonable minds may differ on whether management has changed "in substantial part" under facts like those here. However, this is a question that LIRC is better suited than this court to decide. And, in this respect, we conclude that LIRC made a reasonable decision based on the statutory language and the facts before it.

¶ 36. Neenah Foundry's remaining argument on the mandatory successor question relates to language in Wis. Stat. § 108.16(8)(e) requiring that the Department "determine[]" that each of the three mandatory

---

[8] The parties dispute whether Neenah Foundry or the Department has the burden of proof. We see no need to weigh in on this dispute. Assuming without deciding that the Department has the burden, the Department met its burden because, as we say in the text, the retained officers' titles and Neenah Foundry's size support an inference that the officers exercised significant management authority. Neenah Foundry was free to marshal facts to the contrary, but did not.

successor conditions is met. Neenah Foundry asserts that the Department here never relied on the "managed" theory that LIRC used and, therefore, "the Department could not have *determined* that Reorganized Neenah was *managed* by the same interests" (emphasis added). We are not persuaded.

¶ 37. Although it is true that the Department has not relied on the specific "managed" theory that LIRC used in its decision, the Department has argued more generally throughout these proceedings that Neenah Foundry satisfies the owned-managed-or-controlled-by-the-same-interests condition in Wis. Stat. § 108.16(8)(e)1. We see no reason why the Department had to advance the same specific reasoning LIRC used in its decision in order to "determine" that Neenah Foundry satisfied this condition. And, Neenah Foundry does not argue that there is some *other* reason the Department failed to make the required determination.

¶ 38. In sum as to LIRC's mandatory successor determination, we conclude that LIRC reasonably interpreted Wis. Stat. § 108.16(8)(e) to conclude that Neenah Foundry is a mandatory successor. We turn finally to Neenah Foundry's federal preemption argument.

### 3. Preemption

¶ 39. Neenah Foundry argues that federal law preempts LIRC's determination that Neenah Foundry is a mandatory successor. The parties do not provide any standard of review arguments particular to this issue. Regardless, we conclude that our standard of review does not matter because we agree with LIRC

482

that Neenah Foundry's preemption argument is not persuasive. That is, even applying the no-deference standard of review, which is the standard most favorable to Neenah Foundry, we would uphold LIRC on this issue.

¶ 40. Neenah Foundry argues that federal law preempts LIRC's mandatory successor determination because, in Neenah Foundry's words, federal bankruptcy law "prevents the application of a pre-bankruptcy experience rating to increase the reorganized entity's [unemployment] taxes." Neenah Foundry goes on to assert that a Chapter 11 reorganization "free[s] [the debtor] from pre-petition interests, including an adverse experience rating."

¶ 41. As the primary support for its assertions, Neenah Foundry relies on five cases: *Massachusetts Dep't of Unemployment Assistance v. OPK Biotech, LLC*, 484 B.R. 860 (B.A.P. 1st Cir. 2013); *Hollytex Carpet Mills, Inc. v. Oklahoma Emp't Sec. Comm'n*, 73 F.3d 1516 (10th Cir. 1996) (adopting an unpublished district court decision, Case No. CIV-95–48–R); *In re USA United Fleet, Inc.*, 496 B.R. 79 (Bankr. E.D.N.Y. 2013); *In re Tougher Indus.*, Nos. 06–12960 and 07–10022, 2013 WL 1276501 (Bankr. N.D.N.Y. Mar. 27, 2013); and *Ouray Sportswear, LLC v. Industrial Claim Appeals Office*, 315 P.3d 1280 (Colo. App. 2013).

¶ 42. We begin with *Hollytex*, which actually contradicts Neenah Foundry's preemption argument. We then turn to the other four cases and explain why we agree with the Department that those cases are distinguishable.

¶ 43. Contrary to Neenah Foundry's argument, the court in *Hollytex* explained that "all courts considering the issue . . . [have held] that a state agency is, *under most circumstances, permitted* to utilize a Chap-

ter 11 debtor's pre-petition history and experience factors when determining unemployment contribution rates for the reorganized debtor after confirmation of a plan." *Hollytex*, 73 F.3d at 1522 (emphasis added); *see also Michigan Emp't Sec. Comm'n v. Wolverine Radio Co.*, 930 F.2d 1132, 1146 (6th Cir. 1991) (cited in *Hollytex* and stating: "We find no frustration of federal law by [a state agency] assigning successor liability to [the successor entity], as [the agency's] transfer of [the predecessor entity]'s experience rating does not violate the reorganization plan nor clearly conflict with any provisions of the Bankruptcy Code."); *In re Primrose Bedspread Corp.*, 67 B.R. 659, 661 (Bankr. D.N.J. 1986) (cited in *Hollytex* and rejecting debtor's argument that its pre-Chapter-11 petition experience constituted a debt).

¶ 44. The court in *Hollytex* went on to explain that the preemption analysis is different, however, when a debtor-employer receives an adverse experience rating because of its failure to make pre-Chapter 11 unemployment contributions, as contrasted with other factors, such as the company's history of laying off workers. *See Hollytex*, 73 F.3d at 1522–23. The court reasoned that there is preemption in the delinquent contribution situation because the delinquency is a debt that is discharged, and an experience rating based on a discharged "claim" or "debt" is itself a bankruptcy-related "debt" that must be deemed discharged. *See id.* at 1522–24. "[A]n increased contribution rate based upon the application of [state law] to . . . unpaid, pre-petition unemployment contributions is a debt which was discharged upon confirmation of [the] . . . Chapter 11 Plan of reorganization." *Id.* at 1523.

¶ 45. Here, there is no dispute that Neenah Foundry's adverse experience rating is *not* based on

484

delinquent contributions. Neenah Foundry stipulated below that it was current in paying its unemployment insurance contributions as of the date it filed its Chapter 11 petition. As we have seen, Neenah Foundry's adverse experience rating is instead based on Neenah Foundry's layoff history. Thus, under *Hollytex*, there was no resulting debt that was discharged in the bankruptcy.[9]

¶ 46. We turn to the other four cases on which Neenah Foundry places primary reliance: *OPK Biotech, USA United Fleet, Tougher Industries,* and *Ouray Sportswear*. As the Department points out, each of these cases is distinguishable because, unlike here, each involved an asset sale from a debtor to a third-party purchaser and a particular corresponding asset sale provision in the bankruptcy code, 11 U.S.C. § 363(f), that was not applied in Neenah Foundry's situation. *See OPK Biotech,* 484 B.R. at 861–62; *USA United Fleet,* 496 B.R. at 81–82; *Tougher Indus.,* Nos. 06–12960 and 07–10022, 2013 WL 1276501, at *1; *Ouray Sportswear,* 315 P.3d at 1281. This particular code section, § 363(f),

---

[9] Our characterization of Neenah Foundry as "current" in its contributions is an accurate characterization of Neenah Foundry's stipulation, but it oversimplifies matters to some degree. The record shows that, as part of the unemployment insurance system, the Department maintains an "account" for each employer that can have a positive or negative "balance" related to the employer's experience rating. And, here, it appears that Neenah Foundry had a negative balance at the time it filed its Chapter 11 petition. However, we do not understand Neenah Foundry to be arguing that this negative balance makes Neenah Foundry's situation akin to a delinquency situation like the one in *Hollytex Carpet Mills, Inc. v. Oklahoma Employment Security Commission,* 73 F.3d 1516 (10th Cir. 1996). Moreover, if Neenah Foundry meant to make that argument, it has failed to make that clear, let alone backed up the argument with sufficient factual or legal support.

provides that "[t]he trustee may [if certain conditions are met] sell property . . . *free and clear of any interest . . . of an entity* other than the estate" (emphasis added). In each of the four cases, the court applied § 363(f) to conclude that the debtor's experience rating could not be transferred to the purchasing entity. *OPK Biotech*, 484 B.R. at 866–70; *USA United Fleet*, 496 B.R. at 83, 85–87, 89; *Tougher Indus.*, Nos. 06–12960 and 07–10022, 2013 WL 1276501, at *6–8; *Ouray Sportswear*, 315 P.3d at 1281, 1282–84.

¶ 47. In its reply brief on appeal, Neenah Foundry all but concedes that these four cases are distinguishable for the reason the Department says, but Neenah Foundry argues that the different bankruptcy code provision that applies here, 11 U.S.C. § 1141(c), contains similar language to that in 11 U.S.C. § 363(f). Section 1141(c) states: "[Subject to certain exceptions], after confirmation of a plan, the property dealt with by the plan *is free and clear of all claims and interests of creditors,* equity security holders, and of general partners in the debtor." (Emphasis added.)

¶ 48. Neenah Foundry's focus appears to be on the fact that the two bankruptcy code provisions contain similar "interest" language: in 11 U.S.C. § 363(f), property being made "free and clear" of "any interest," and in 11 U.S.C. § 1141(c), property being made "free and clear" of "all . . . interests." And, as we have said, Neenah Foundry argues that its adverse experience rating is an "interest."

¶ 49. An immediate problem we see with Neenah Foundry's argument analogizing the two statutes is that the terms "interest" and "interests" have different modifiers in the different code provisions. Specifically, 11 U.S.C. § 363(f) refers to the interest of any "entity" other than the bankruptcy estate, while 11 U.S.C.

§ 1141(c) refers more narrowly to the interests of "creditors, equity security holders, and . . . general partners in the debtor." The Department is plainly not an equity security holder or general partner in Neenah Foundry, so the Department would need to be a "creditor" for § 1141(c) to apply here. And, Neenah Foundry provides little by way of explanation as to why the Department might be considered a "creditor" under § 1141(c).

¶ 50. For example, Neenah Foundry does not point to a bankruptcy code provision that supports classifying the Department as a creditor. Rather, Neenah Foundry relies on the fact that Neenah Foundry continued to incur unemployment compensation obligations during the Chapter 11 proceedings and, along this line, cites to *In re Continental Minerals Corp.*, 132 B.R. 757, 759 (Bankr. D. Nev. 1991), as support for the proposition that this made the Department a creditor. We are not persuaded.

¶ 51. In *Continental Minerals*, unlike the situation here, the unemployment insurance agency made a claim in the bankruptcy proceedings for *unpaid, prepetition* unemployment compensation contributions. *See id.* at 757. Moreover, even if the unemployment compensation contributions that Neenah Foundry had incurred during the Chapter 11 proceedings were an "interest" of a "creditor," it does not clearly follow that Neenah Foundry's *experience rating* is such an "interest."

¶ 52. In short, if there is some good reason why the Department should be deemed a creditor under 11 U.S.C. § 1141(c), and why Neenah Foundry's experience rating should be deemed an "interest" of a creditor under that code provision, Neenah Foundry fails to identify and explain it. Neenah Foundry therefore also fails to persuade us that § 1141(c) has the same effect

here as 11 U.S.C. § 363(f) does in asset sale cases. There may be additional reasons why § 363(f) and those cases are distinguishable, but it is enough to say here that Neenah Foundry fails to identify and explain why the Department might be a creditor.

¶ 53. Finally, Neenah Foundry directs our attention to language in its Chapter 11 reorganization plan to support its federal preemption argument. Specifically, Neenah Foundry points to reorganization plan language stating that all "property" of the Chapter 11 "Estates" vests in Neenah Foundry "free and clear of all Claims, Liens, charges, other encumbrances and Interests." Neenah Foundry asserts, without citation to authority or further explanation, that its experience rating and corresponding account balance with the Department "was a 'charge' or 'encumbrance' " under that reorganization plan language. This argument is undeveloped, and our independent effort to discern merit in it has come up short. Therefore, we consider it no further. *See State v. Pettit*, 171 Wis. 2d 627, 646–47, 492 N.W.2d 633 (Ct. App. 1992) (we need not consider inadequately developed arguments).

¶ 54. In sum, Neenah Foundry fails to persuade us that federal bankruptcy law preempts LIRC's mandatory successor determination.

### Conclusion

¶ 55. For the reasons stated above, we conclude that LIRC reasonably determined that Neenah Foundry is a mandatory successor and that LIRC's determination is not preempted. Accordingly, we affirm the circuit court's order upholding LIRC's decision.

*By the Court.*—Order affirmed.